86 N.Y.2d 286 (1995)
655 N.E.2d 649
631 N.Y.S.2d 553
City of New York et al., Appellants,
v.
State of New York et al., Respondents.
Court of Appeals of the State of New York.
Argued February 16, 1995.
Decided June 15, 1995.
Paul A. Crotty, Corporation Counsel of New York City (Leonard Koerner, Lorna B. Goodman, Pamela Seider Dolgow, David B. Goldin, Elizabeth S. Natrella, Florence A. Hutner and Shari M. Goodstein of counsel), and Cleary, Gottlieb, Steen & Hamilton, New York City (Evan A. Davis, Lawrence T. Gresser, Denise C. Morgan and Marcia L. Narine of counsel), for appellants.
Dennis C. Vacco, Attorney-General, New York City (Mark G. Peters, Victoria A. Graffeo, Andrea Green, Harvey J. Golubock, Jeffrey I. Slonim and Clement J. Colucci of counsel), for respondents.
Stroock & Stroock & Lavan, New York City (Alan M. Klinger and Adam S. Grace of counsel), Rhonda Weingarten and Frederick K. Reich for United Federation of Teachers, amicus curiae.
Judges SIMONS, TITONE and BELLACOSA concur with Judge LEVINE; Judge CIPARICK dissents in a separate opinion in which Judge SMITH concurs; Chief Judge KAYE taking no part.
*289 LEVINE, J.
The City of New York, Board of Education of the City, its Mayor and Chancellor of the City School District (hereinafter the municipal plaintiffs) have brought this action against the State and various State officials seeking declaratory and injunctive relief. They allege three causes of action in their amended complaint: (1) that the present State statutory scheme for funding public education denies the school children of New York City their educational rights guaranteed by the Education Article of the State Constitution (NY Const, art XI, § 1); (2) that the State's funding of public schools provides separate and unequal treatment for the public schools of New York City in violation of the Equal Protection Clauses of the Federal and State Constitutions (US Const 14th Amend; NY Const, art I, § 11); and (3) that the disparate impact of the State's funding scheme for public education on members of racial and ethnic minority groups in New York City violates title VI of the Federal Civil Rights Act of 1964 (42 USC § 2000d et seq.) as amended and its implementing regulations.
We agree with the courts below that the municipal plaintiffs lack the legal capacity to bring this suit against the State. Despite their contrary claims, the traditional principle throughout the United States has been that municipalities and other local governmental corporate entities and their officers lack capacity to mount constitutional challenges to acts of the State and State legislation. This general incapacity to sue flows from judicial recognition of the juridical as well as political relationship between those entities and the State. Constitutionally as well as a matter of historical fact, municipal *290 corporate bodies  counties, towns and school districts  are merely subdivisions of the State, created by the State for the convenient carrying out of the State's governmental powers and responsibilities as its agents. Viewed, therefore, by the courts as purely creatures or agents of the State, it followed that municipal corporate bodies cannot have the right to contest the actions of their principal or creator affecting them in their governmental capacity or as representatives of their inhabitants. Thus, the United States Supreme Court has held:
"`A municipal corporation is simply a political subdivision of the State, and exists by virtue of the exercise of the power of the State through its legislative department. The legislature could at any time terminate the existence of the corporation itself, and provide other and different means for the government of the district comprised within the limits of the former city. The city is the creature of the State.'" (Trenton v New Jersey, 262 US 182, 189-190, quoting Worcester v Street Ry. Co., 196 US 539, 548.)
"The distinction between the municipality as an agent of the State for governmental purposes and as an organization to care for local needs in a private or proprietary capacity has been applied in various branches of the law of municipal corporations" (id., at 191 [challenge to New Jersey statute under Due Process and Contract Clauses of the US Constitution]).
"A municipal corporation, created by a state for the better ordering of government, has no privileges or immunities under the federal constitution which it may invoke in opposition to the will of its creator" (Williams v Mayor, 289 US 36, 40 [Cardozo, J.] [Equal Protection Clause challenge to Maryland statute]).
New York has long followed the Federal rationale for finding that municipalities lack the capacity to bring suit to invalidate State legislation (see, County of Albany v Hooker, 204 N.Y. 1; City of New York v Village of Lawrence, 250 N.Y. 429; Robertson v Zimmermann, 268 N.Y. 52). As stated in Black Riv. Regulating Dist. v Adirondack League Club (307 N.Y. 475, appeal dismissed 351 US 922):

*291 "The courts of this State from very early times have consistently applied the Federal rule in holding that political power conferred by the Legislature confers no vested right as against the government itself. * * * The concept of the supreme power of the Legislature over its creatures has been respected and followed in many decisions." (Id., at 488.)
The rationale was succinctly described in Matter of County of Cayuga v McHugh (4 N.Y.2d 609):
"Counties, as civil divisions of a State, had their origin in England and were formed to aid in the more convenient administration of government * * *. So it is today that counties are mere political subdivisions of the State, created by the State Legislature and possessing no more power save that deputed to them by that body." (Id., at 614.)
Moreover, our Court has extended the doctrine of no capacity to sue by municipal corporate bodies to a wide variety of challenges based as well upon claimed violations of the State Constitution (see, Black Riv. Regulating Dist. v Adirondack League Club, supra; City of New York v Village of Lawrence, supra; County of Albany v Hooker, supra).
Municipal officials and members of municipal administrative or legislative boards suffer the same lack of capacity to sue the State with the municipal corporate bodies they represent (see, Williams v Mayor, 289 US 36, supra). As we held in Black Riv. Regulating Dist. v Adirondack League Club (307 NY, at 489, supra):
"As we have pointed out, the district board has no special character different from that of the State. Its only purpose is to construct reservoirs and that, concededly, is a State purpose in the interest of public health, safety and welfare (Conservation Law, § 431). Not only as a board, but also as individuals, the plaintiffs are without power to challenge the validity of the act or the Constitution" (emphasis supplied).
The only exceptions to the general rule barring local governmental challenges to State legislation which have been identified in the case law are: (1) an express statutory authorization to bring such a suit (County of Albany v Hooker, 204 NY, at 9, supra); (2) where the State legislation adversely affects a municipality's proprietary interest in a specific fund *292 of moneys (County of Rensselaer v Regan, 173 AD2d 37, affd 80 N.Y.2d 988; Matter of Town of Moreau v County of Saratoga, 142 AD2d 864); (3) where the State statute impinges upon "Home Rule" powers of a municipality constitutionally guaranteed under article IX of the State Constitution (Town of Black Brook v State of New York, 41 N.Y.2d 486); and (4) where "the municipal challengers assert that if they are obliged to comply with the State statute they will by that very compliance be forced to violate a constitutional proscription" (Matter of Jeter v Ellenville Cent. School Dist., 41 N.Y.2d 283, 287 [citing Board of Educ. v Allen, 20 N.Y.2d 109, affd 392 US 236]).
The arguments by the municipal plaintiffs favoring their capacity to sue are unpersuasive. First, they contend that our decision in Levittown (Board of Educ., Levittown Union Free School Dist. v Nyquist, 57 N.Y.2d 27) constitutes controlling precedent in favor of their capacity to sue. As the municipal plaintiffs have virtually conceded, however, when Levittown reached the Court of Appeals, the State did not appeal on the capacity to sue issue. The issue of lack of capacity to sue does not go to the jurisdiction of the court, as is the case when the plaintiffs lack standing. Rather, lack of capacity to sue is a ground for dismissal which must be raised by motion and is otherwise waived (CPLR 3211 [a] [3]; [e]). It follows, then, that if the defense of lack of capacity to sue can be waived by merely failing to raise it, it may also be abandoned on appeal and, in fact, was abandoned by the State when its appeal in Levittown reached our Court. Therefore, the Levittown decision is not precedent for the municipal plaintiffs' capacity to sue in this case.
Alternatively, the municipal plaintiffs argue that our decision in Community Bd. 7 v Schaffer (84 N.Y.2d 148) supports their capacity to sue in this case. To be sure, Community Bd. 7 held that a municipal body's capacity to sue may arise by necessary implication. However, Community Bd. 7 unequivocally holds that, in the absence of express authority to bring the specific action in question the plaintiff must establish a legislative intent to confer such capacity to sue by inference. "Governmental entities created by legislative enactment present similar capacity problems. Being artificial creatures of statute, such entities have neither an inherent nor a common-law right to sue. Rather, the right to sue, if it exists at all, must be derived from the relevant enabling legislation or some other concrete statutory predicate" (id., at 155-156 [emphasis *293 supplied]). Thus, in Community Bd. 7, even though the plaintiff had an identifiable functional responsibility in the subject matter of the lawsuit, this Court concluded it lacked capacity to bring the suit because various inclusions or omissions in the enabling legislation negated any inference of a legislative intent to confer that power (id., at 157-158).
The municipal plaintiffs have not pointed to any express statutory language or legislative history which would necessarily imply that the Legislature intended to confer upon them the capacity to bring a suit challenging State legislation. The fact that the Legislature has expressly conferred the power to sue upon the City or the City School District in furtherance of their general statutory municipal or educational responsibilities is clearly insufficient from which to imply authority to bring suit against the State itself to declare that the public school funding scheme enacted by the Legislature is unconstitutional (see, County of Albany v Hooker, 204 N.Y. 1, supra [discussing extensively the difference between the general power to sue by a municipal corporation, and the same municipality's lack of capacity to sue its creator, the State]). Indeed, from early times municipalities have had the statutory general power to sue and be sued in their own name (see, People v Ingersoll, 58 N.Y. 1, 28-31; see also, County Law § 51 [current authority for counties to sue in their own name]), but that power has always been limited "[i]n political and governmental matters [because] municipalities are the representatives of the sovereignty of the State, and auxiliary to it" (People v Ingersoll, 58 NY, at 29, supra). Moreover, in view of the manifest improbability that the Legislature would have intended to authorize the municipal plaintiffs to challenge the constitutionality of its own public school funding allocation formula, the evidence from "necessary implication" would have to be particularly strong to support capacity to sue here, and it certainly is not. Hence, Community Bd. 7 v Schaffer does not provide a precedential basis for capacity to sue here.
Next, the municipal plaintiffs argue that the lack of capacity to sue doctrine only applies to (1) statutory restrictions on a municipality's power; and (2) State-mandated compulsion to make expenditures. This contention ignores our precedents in which lack of capacity to sue has applied to block challenges to a far wider variety of State actions having differing adverse impacts on local governmental bodies and their constituents (see, Matter of County of Cayuga v McHugh, supra; Black Riv. Regulating Dist. v Adirondack League Club, supra; Robertson v Zimmermann, supra; *294 and County of Albany v Hooker, supra). County of Albany v Hooker is particularly instructive because it involved a claim quite analogous to the claims of the municipal plaintiffs in the instant case. Albany County relied upon a 1905 amendment to the State Constitution authorizing the State to incur debts of up to $50 million for improvements to State highways (204 N.Y. 1, 5, supra). To pay the principal and interest on such debts, the amendment provided for the creation of a sinking fund made up of at least half State moneys and the remainder from counties and towns where the improvements were located. The amendment guaranteed that enabling statutes would equitably apportion the highway improvements among the counties (id.). Not unlike the claim here of an unfair allocation of educational funding violating the State Constitution, in County of Albany v Hooker, the county challenged 1911 State legislation providing for highway improvements elsewhere in the State, as violating the constitutional mandate for equitable apportionment of highway improvements. This Court determined that the County of Albany lacked the capacity to bring the suit. We recognized that the underlying purpose of the action was to vindicate the interests and rights of the inhabitants of the county to a fair apportionment of the public moneys devoted to highway improvement (id., at 17). We held in Hooker, however, that counties lack the capacity to sue the State to protect such rights of or redress such wrongs or injuries to their citizens (id., at 14). The holding in County of Albany v Hooker is directly on point regarding the lack of capacity of the municipal plaintiffs to sue in the instant case.
"With no fund or property in existence, the title to which is in the county, and no funds or property in the possession of another to which the county is entitled to possession, and the entire subject being one of governmental and public policy, independent of the corporate rights of the county, the action cannot be maintained by the plaintiff, and the wrong, if any, created and existing by the acts of the legislature, must be corrected by the legislature, or by an action where the people, as distinguished from a municipal corporate body, are before the court" (id., at 18-19).
The only remaining argument made by the municipal plaintiffs in favor of their capacity to sue is that they are challenging legislation which adversely affects the City's proprietary *295 interests. Clearly, however, they fail to point to any specific fund in which they are entitled to a proprietary interest. Their claim is merely to a greater portion of the general State funds which the Legislature chooses to appropriate for public education. Accordingly, they lack a proprietary interest in a fund or property to which their claims relate and cannot ground capacity to sue on that basis (see, County of Albany v Hooker, supra) under the criteria set in Matter of Town of Moreau v County of Saratoga (142 AD2d 864, supra) and County of Rensselaer v Regan (173 AD2d 37, supra). Finding a proprietary interest of the City of New York sufficient to confer capacity to sue without regard to a cognizable right in a specific fund would create a municipal power to sue the State in any dispute over the appropriate amount of State aid to a governmental subdivision or the appropriate State/local mix of shared governmental expenses. The narrow proprietary interest exception would then ultimately swallow up the general rule barring suit against the State by local governments.
Although not a point advanced by the municipal plaintiffs on this appeal, the dissent seeks to bring this case within the already noted exception to the lack of capacity to sue rule, where municipal officials contend that "`if they are obliged to comply with the State statute they will by that very compliance be forced to violate a constitutional proscription'" (dissenting opn, at 298-299 [quoting Matter of Jeter v Ellenville Cent. School Dist., 41 N.Y.2d 283, 287, supra] [emphasis supplied]). The dissent fails to cite to any specific constitutional "proscription", that is, prohibition, that the State school funding formula forces the municipal officials to violate. Surely, it cannot be persuasively argued that the City officials in question should be held accountable either under the Equal Protection Clause or the State Constitution's public Education Article by reason of the alleged State underfunding of the New York City school system over which they have absolutely no control (see, Athanson v Grasso, 411 F Supp 1153).
Thus, the municipal plaintiffs have failed to bring their claims within any recognized exception to the general rule that municipalities lack capacity to sue the State and their action must be dismissed. We decline the invitation to erode that general rule. Our adherence to that rule is not, as suggested by the dissent "a regression into formalism and rigidity" (dissenting opn, at 303). The lack of capacity of municipalities to sue the State is a necessary outgrowth of separation *296 of powers doctrine: it expresses the extreme reluctance of courts to intrude in the political relationships between the Legislature, the State and its governmental subdivisions.
The order of the Appellate Division should be affirmed, with costs.
CIPARICK, J. (dissenting).
I respectfully dissent. If our complex, collaborative system of education is to work, and if local control and autonomy at the school district and Board of Education level is to have real meaning, the Legislature and other governmental officials responsible for maintaining the educational system cannot be immunized from accountability in a suit of this nature. The Legislature has delegated virtually all of the day-to-day responsibilities involving the provision of education and the management of educational affairs to local authorities. When these local entities are unable to fulfill their constitutional and statutory obligations because of the State's failure to carry out its own constitutional obligations, a substantive right to sue has been and must continue to be recognized (see, Matter of Jeter v Ellenville Cent. School Dist., 41 N.Y.2d 283, 287; Board of Educ. v Allen, 20 N.Y.2d 109, 118; Board of Educ., Levittown Union Free School Dist. v Nyquist, 83 AD2d 217, 234, mod 57 N.Y.2d 27). Accordingly, we would hold that the New York City Board of Education and the Chancellor of the City School District (school plaintiffs) have the capacity to bring this action. We also would hold that New York City and its Mayor (city plaintiffs) have capacity to bring this suit for reasons we discuss below.
This is a declaratory judgment action challenging the constitutionality and legality of New York State's current statutory methodology for financing public education. Supreme Court dismissed plaintiffs' complaint in its entirety for lack of capacity to sue. The Appellate Division agreed, reasoning that "units of municipal government, as political subdivisions created by the State, lack the capacity (with very limited exceptions not applicable here) to challenge in a lawsuit the constitutionality of State legislative enactments affecting them (Town of Black Brook v State of New York, 41 N.Y.2d 486, 488; Matter of Jeter v Ellenville Cent. School Dist., 41 N.Y.2d 283, 287)" (205 AD2d 272, 277-278).

I.
Although courts often use the terms interchangeably, the concepts of capacity to sue and standing are distinct (see, *297 Community Bd. 7 v Schaffer, 84 N.Y.2d 148, 155). Capacity to sue "concerns a litigant's power to appear and bring its grievance before the court" (id., at 155). Standing is "designed to ensure that the party seeking relief has a sufficiently cognizable stake in the outcome" so as to cast the controversy "`"in a form traditionally capable of judicial resolution"'" (id., at 154-155 [quoting Society of Plastics Indus. v County of Suffolk, 77 N.Y.2d 761, 772]). "Capacity, or the lack thereof, sometimes depends purely upon a litigant's status" (Community Bd. 7, supra, at 155). For instance, an infant or an individual adjudicated incompetent may be disqualified from seeking relief in court (id.).
The question of capacity to sue often arises when governmental entities, which are creatures of statute, attempt to sue. In that context, the right to sue, "if it exists at all, must be derived from the relevant enabling legislation or some other concrete statutory predicate" (id., at 156 [citing Matter of Pooler v Public Serv. Commn., 58 AD2d 940, affd on mem below 43 N.Y.2d 750; Matter of Flacke v Freshwater Wetlands Appeals Bd., 53 N.Y.2d 537]).
We first address the capacity of the school plaintiffs. Plaintiff Board of Education's authority to sue is well recognized in case law. This Court has observed that the Board of Education of the City of New York is not a mere department of government, but "an independent corporate body" which "may sue and be sued in its corporate name" (Matter of Divisich v Marshall, 281 N.Y. 170, 173) "in all matters relating to the control and management of the schools" (Gunnison v Board of Educ., 176 N.Y. 11, 17; see also, Matter of Fleischmann v Graves, 235 N.Y. 84). As to whether the City Board of Education can sue the State in matters relating to the control and management of the schools, we conclude that the answer is yes based on our examination of relevant authority.
In Board of Educ. v Allen (20 N.Y.2d 109), several local Boards of Education challenged the constitutionality of a State statute permitting school authorities to loan textbooks free of charge to children enrolled in parochial schools. This Court stated: "The cases holding that a public body has no standing to challenge a State statute restricting its governmental powers are not in point (e.g., City of Buffalo v. State Bd. of Equalization, 26 A D 2d 213; County of Albany v. Hooker, 204 N.Y. 1, 9-10; Black Riv. Regulating Dist. v. Adirondack League Club, 307 N.Y. 475, 487; St. Clair v. Yonkers Raceway, 13 N Y 2d 72, 76, cert. den. 375 U. S. 970)" *298 (id., at 118). The reason for our conclusion, we stated, was adequately set forth in the opinion by Special Term:
"Granted there is apparent substantial authority prohibiting a municipality or agency of the State from challenging a State statute (Black Riv. Regulating Dist. v. Adirondack League Club, 307 N.Y. 475), but the rule could be subject to some conditions and limitations, which appear particularly appropriate in the pending matter. A school district and its Board of Education is more than a mere agent of the State. It is an entity performing a State purpose pursuant to the mandate of the People as directed by their Constitution. (N. Y. Const., art. XI, § 1; Education Law, § 2, subd. 14; Matter of Divisich v. Marshall, 281 N.Y. 170.)" (Board of Educ. v Allen, 51 Misc 2d 297, 299 [emphasis added].)
We further noted in Allen that the plaintiffs were not seeking to augment their powers, but were "asking for a court determination (in the form of a declaratory judgment) concerning whether they are legally authorized to spend public money for purposes purporting to be authorized by [the] statute", and that "[t]he right of a local Board of Education to sue the State Commissioner of Education has frequently been upheld including actions involving the question of constitutionality of State statutes. (Matter of Board of Educ. of Cent. School Dist. No. 2 v. Allen, 14 A D 2d 429; Matter of Bethlehem Union Free School Dist. v. Wilson, 303 N.Y. 107; Matter of Board of Educ. of Union Free School Dist. No. 3 v. Allen, 6 A D 2d 316, affd. 6 N Y 2d 871.)" (20 NY2d, at 118).
Here, as in Allen, school plaintiffs are not attempting to augment their powers, but instead seek a determination in the form of a declaratory judgment that the State is not in compliance with its constitutional obligations. School plaintiffs complain that the statutory scheme for funding public education fails to provide them with sufficient resources to enable them to discharge their obligations under the Education Article of the State Constitution. This case thus falls squarely within a well-defined exception to the general rule of lack of capacity to sue which arises where "municipal challengers assert that if they are obliged to comply with the State statute they will by that very compliance be forced to violate a *299 constitutional proscription" (see, Matter of Jeter v Ellenville Cent. School Dist., 41 N.Y.2d 283, 287; Allen, supra).
A more recent recognition of the right of local school authorities to sue the State occurred in Levittown (83 AD2d 217, 234, mod 57 N.Y.2d 27, supra). The plaintiffs there were the City of New York and the Boards of Education of various property-poor school districts, including New York City, Buffalo, Rochester, and Syracuse. The State defendants challenged the plaintiffs' capacity to sue in the lower courts. The Appellate Division ruled in favor of the plaintiffs, stating:
"Two of defendants' threshold contentions  both fastening upon aspects of justiciability * * *  merit summary dispatch. The various boards of education have standing to make the current challenge (see Board of Educ. v Allen, 20 N.Y.2d 109, affd 392 US 236), and, in view of the `expanding scope of standing' * * * the school children represented by their parents have similar status" (Levittown, 83 AD2d 217, 233-234 [citations omitted]).
Although the Levittown Appellate Division used the term standing, as courts often do, the Court was clearly addressing the capacity issue as evidenced by its citation to Allen.
On appeal, this Court reached the merits, stating that it was our responsibility "to adjudicate contentions that actions taken by the Legislature and the executive fail to conform to the mandates of the Constitutions which constrain the activities of all three branches" (57 NY2d, at 39). Although the Levittown defendants did not argue lack of capacity before this Court, there is no question in my mind that the Appellate Division's decision, which stands for the proposition that the State can be sued in a declaratory judgment action challenging the constitutionality of the public school funding scheme, was correct and should be followed here.
In our view, the majority's extremely limited application of the general rule of lack of capacity is inappropriate here because it undermines the power and autonomy of local Boards of Education. Public education in New York is a complex, collaborative enterprise between a decentralized State authority and autonomous local districts endowed with broad powers and responsibilities for the management and control of day-to-day educational affairs:
"Our State Constitution mandates that the `legislature shall provide for the maintenance and support *300 of a system of free common schools, wherein all the children of this state may be educated' (N. Y. Const., art. XI, § 1; emphasis supplied). The Legislature has imposed this duty in cities upon local boards of education (Education Law, § 2554)." (Matter of Wiltwyck School for Boys v Hill, 11 N.Y.2d 182, 191 [emphasis added]; see also, Herman v Board of Educ., 234 N.Y. 196, 202 ["The board of education is the agency to which the state delegates the power and duty of controlling the schools in the district"].)
The right to sue logically and necessarily derives from this statutory state of affairs. Indeed, how are local school districts to discharge their many duties if they are powerless to hold the State responsible where, as here, it is claimed that the State is failing to carry out its own constitutional mandate with respect to funding public education? For our system of education to work, there must be accountability.
Contrary to the majority's view, local school districts and Boards of Education are not mere "artificial creatures of statute" (majority opn, at 292); rather, they are substantially autonomous entities entrusted with carrying out a State purpose, and they possess broad powers and duties delegated to them by the State through Education Law § 2554. The City Board of Education is charged with the general administration and control of all aspects of educational affairs. Among other powers, duties, and responsibilities, it is empowered to create, abolish, and maintain positions, divisions, boards, bureaus, etc. (Education Law § 2554 [2]); appoint superintendents, examiners, directors, principals, teachers, nurses, etc. (id.); take care, custody, control and safekeeping of all school property and dispose of and sell all property (Education Law § 2554 [4], [5]); lease property for school accommodations (Education Law § 2554 [6]); purchase and furnish equipment, books, textbooks, furniture, and other supplies as may be necessary for the use of children (Education Law § 2554 [7]); establish, maintain and equip libraries and playgrounds (Education Law § 2554 [10]); and, authorize the general courses of study in schools and approve the content of such courses (Education Law § 2554 [11]). The powers and duties delegated to plaintiff Board of Education have also been delegated to plaintiff Chancellor through Education Law § 2590-h (17).
The majority's reliance on several older United States Supreme *301 Court decisions which merely state the general rule that municipal corporations are but agents of the State have little persuasive value in the specific context of this modern-day challenge to the constitutionality of the State's public school financing scheme (see, majority opn, at 290).[1] The cases cited by the majority fail to reflect the Supreme Court's more recently expressed view that local school districts are not mere arms of the State, but actually possess a significant degree of independence and autonomy which must be recognized and respected.
In Milliken v Bradley (418 US 717), the Supreme Court rejected interdistrict busing as a remedy for unconstitutional segregation in the Detroit, Michigan, public school system. The District Court in Milliken, as does the majority here, took a narrow view of local school districts as mere political subdivisions established for administrative convenience (see, id., at 741). The Supreme Court soundly rejected this analytical approach as "contrary to the history of public education in our country" (id., at 741). The Supreme Court noted that in Michigan, as in this State, school districts are formally considered "instrumentalities of the State and subordinate to its State Board of Education and its legislature" (id., at 726, n 5). Nonetheless, while Michigan school districts were instrumentalities of the State in theory, in practice the Michigan educational structure actually endowed them with "a large measure of local control" (id., at 742) over day-to-day educational affairs, as evidenced by their statutory powers to acquire real and personal property, hire and contract with personnel, borrow money, determine the length of school terms, determine courses of study, make rules and regulations for operating schools, and so on (id., at 742, n 20). Thus, although school districts are, in theory, creatures of the State, the State's theoretical supremacy must sometimes give way to the realities of local control and autonomy, most especially in the area of education:
"No single tradition in public education is more deeply rooted than local control over the operation of schools; local autonomy has long been thought essential both to the maintenance of community *302 concern and support for public schools and to [the] quality of the educational process. See Wright v. Council of the City of Emporia, 407 U. S., at 469. Thus, in San Antonio School District v. Rodriguez, 411 U. S. 1, 50 (1973), we observed that local control over the educational process affords citizens an opportunity to participate in decisionmaking, permits the structuring of school programs to fit local needs, and encourages `experimentation, innovation, and a healthy competition for educational excellence.'" (Id., at 741-742.)
In Washington v Seattle School Dist. No. 1 (458 US 457), the Supreme Court permitted a local school district to assert the Fourteenth Amendment to invalidate a State initiative aimed at banning the use of mandatory busing as a means of promoting integration in Washington's public schools. The Court acknowledged the State's formal authority over local school districts, but found it highly significant that "Washington has chosen to meet its educational responsibilities primarily through `state and local officials, boards, and committees,' * * * and the responsibility to devise and tailor educational programs to suit local needs has emphatically been vested in the local school boards" (id., at 477-478 [citations omitted]; see also, Lawrence County v Lead-Deadwood School Dist., 469 US 256 [Supreme Court permitted a South Dakota county to assert the Supremacy Clause to preempt State law limiting discretion to use Federal funds]).
The Supreme Court of Kentucky has addressed the precise issue before us today, holding that local school districts have capacity to sue the legislature in the context of a constitutional challenge to the public school financing scheme (see, Rose v Council for Better Educ., 790 SW2d 186, 201, n 16). Notably, the court rejected the same "sterile logic" the majority resurrects today  that local Boards of Education are creatures of the State who cannot sue the State (id., at 200). We agree with the Kentucky court's reasoning that such a rule would be illogical in light of the many broad and specific powers conferred upon school districts by the legislature and the absence of any statutory restriction on the right of local boards to sue (id.). The Kentucky court stated, in words that could not be more fitting here:
"The subject matter of this lawsuit is whether the General Assembly has complied with its constitutional *303 duty to provide an `efficient' system of common schools in Kentucky. Who is better qualified, who is more knowledgeable, who is more duty-bound, than the local school boards to raise the question? If the General Assembly is not adequately meeting its responsibility, how can the local boards meet theirs?" (Id., at 200.)
As the Kentucky Supreme Court stated, "a lawsuit to declare an education system unconstitutional falls within the authority, if not the duty, of local school boards to fulfill their statutory responsibilities, no matter who the defendants are" (id., at 201).
The majority's extensive quotation of Black Riv. (307 N.Y. 475, supra) reflects a regression into formalism and rigidity (majority opn, at 291). As the majority notes, we held in that case that the plaintiff river regulating district "`has no special character different from that of the State.'" (Id., at 291 [quoting Black Riv., supra, at 489].) Just the opposite is true here. Local school districts and their Boards of Education have a "special character" and place in our State; they cannot be equated with the purely governmental subdivisions at issue in the cases the majority relies upon. As we stated in Levittown:
"`For all of the nearly two centuries that New York has had public schools, it has utilized a statutory system whereby citizens at the local level, acting as part of school district units containing people with a community of interest and a tradition of acting together to govern themselves, have made the basic decisions on funding and operating their own schools. Through the years, the people of this State have remained true to the concept that the maximum support of the public schools and the most informed, intelligent and responsive decision-making as to the financing and operation of those schools is generated by giving citizens direct and meaningful control over the schools that their children attend'" (Board of Educ., Levittown Union Free School Dist. v Nyquist, 57 N.Y.2d 27, 46, supra).
In our view, the majority's refusal to infer capacity to sue on the part of the school plaintiffs rests on a foundational premise  the State's legal supremacy  that simply cannot be reconciled with reality and actual practice. Local school districts *304 and Boards of Education possess substantial independence and control, the significance of which must be recognized and respected rather than ignored.

II.
A governmental entity's capacity to bring suit may be inferred as a necessary incident of its powers and responsibilities, provided that no clear legislative intent negates review (see, Matter of City of New York v City Civ. Serv. Commn., 60 N.Y.2d 436, 444-445). We have stated that the authority to bring a particular claim may be inferred when the agency in question has "functional responsibility within the zone of interest to be protected" (id., at 445). In Community Bd. 7 (supra), we concluded that the petitioner community board had such functional responsibility. The petitioner was challenging a City agency's decision denying it "access to certain documents which, arguably, might be useful in carrying out its statutorily mandated responsibility to study the land use proposal and to make appropriate recommendations to the Borough President and Planning Department" (84 NY2d, at 157 [emphasis added]).[2] The inquiry did not end there, however, and we ultimately concluded that even though petitioner had functional responsibilities within the "zone of interest", other factors negated the inference of capacity, including the actual "terms and history of [petitioner's] own enabling legislation" and its "limited role in the land use planning process" (id., at 157).
Nonetheless, applying this inferred authority standard here, it is clear that the school plaintiffs' authority to sue defendants must be inferred as a necessary incident of their broad powers and responsibilities in all matters relating to the control and management of the schools and in light of the State's decentralized role in our educational structure. School plaintiffs satisfy the "zone of interest" test, as they possess the requisite "policy-making authority and functional responsibility" from which the capacity to sue may be inferred (see, City of New York, 60 NY2d, at 442; Community Bd. 7, supra; cf., Matter of Bradford Cent. School Dist. v Ambach, 56 N.Y.2d 158, 163-164). Moreover, neither the majority nor defendants *305 point to anything negating the inference of capacity on the part of the school plaintiffs in this case. To the contrary, the comprehensive nature of the school plaintiffs' powers and duties unequivocally supports a finding of capacity to sue here.
In conclusion, the City Board of Education is responsible for providing a constitutionally adequate education to the students in its charge. If, as alleged in this case, the current statutory public school financing scheme is so flawed that it effectively prevents the Board from carrying out its responsibilities within its "zone of interest", then the right to seek a declaratory judgment aimed at correcting those flaws must be inferred (see, Community Bd. 7, supra; City of New York, supra; Board of Educ. v Allen, supra; Board of Educ., Levittown Union Free School Dist. v Nyquist, 83 AD2d 217, supra; Rose v Council for Better Educ., supra).
Accordingly, we would hold that the school plaintiffs have capacity to bring this declaratory judgment action challenging the constitutionality of the public school financing system.

III.
Finally, we address the city plaintiffs' capacity to sue. The New York City Charter expressly authorizes the City to sue and be sued, and states in pertinent part:
"Except as otherwise provided in this chapter or other law, the corporation counsel shall have the right to institute actions in law or equity and any proceedings provided by law in any court, local, state or national, to maintain, defend and establish the rights, interests, revenues, property, privileges, franchises or demands of the city or of any part or portion thereof, or of the people thereof" (NY City Charter § 394 [c]).
Thus, New York City, through its Corporation Counsel, may bring suit to protect and vindicate the rights, property, and revenues of the City and its citizens.
The city plaintiffs are responsible for the maintenance and support of public schools in the City School District and have distinct functional responsibilities within the zone of interest to be protected. The City is under a statutory obligation to provide substantial financial support for its school children (see, Education Law § 2576), and if the educational financing *306 system is constitutionally infirm, as is alleged here, the City is obviously affected, as it is saddled with, among other things, an increased financial burden. Moreover, the New York City Charter imposes significant responsibilities on the City with respect to education (see, NY City Charter §§ 520-523). The city plaintiffs' capacity to bring this suit in order to protect the rights, property and revenue of the City must be inferred from these responsibilities and from its financial obligations (see, Community Bd. 7, supra; City of New York, supra).
Accordingly, we would reverse the order of the Appellate Division and reinstate plaintiffs' complaint in its entirety.
Order affirmed, with costs.
NOTES
[1] We consider the majority's heavy reliance on County of Albany v Hooker (204 N.Y. 1) even less persuasive. That case was decided in 1912, well before Allen and other cases which developed the exceptions to the general rule of lack of capacity to sue were decided, and did not even involve educational issues or school entities as plaintiffs.
[2] In Community Bd. 7 we noted that the "zone of interest" test, as used in the capacity context, "is related but not identical to the `zone of interest' analysis that is traditionally applied in the allied area of standing" (84 NY2d, at 156).